# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 11, 2016          Decided February 23, 2016

No. 14-1055

NBCUNIVERSAL MEDIA, LLC,
*PETITIONER*

v.

NATIONAL LABOR RELATIONS BOARD,
*RESPONDENT*

———

Consolidated with 14-1080

———

On Petition for Review and Cross-Application
for Enforcement of a Decision and Order of
the National Labor Relations Board

———

*Paul A. Salvatore* argued the cause for petitioner. On the briefs were *Bernard M. Plum*, *Michael J. Lebowich*, and *Daniel Jerome Davis*.

*Gregoire Sauter*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney. *Amy H. Ginn*, Attorney, entered an appearance.

Before: TATEL and MILLETT, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: NBCUniversal Media, LLC ("NBC" or the "Company") petitions for review of a 2014 Decision and Order of the National Labor Relations Board ("NLRB" or the "Board"). The Board cross-petitions for enforcement. Because, as described below, we are unable to discern the rationale underlying a significant portion of the Board's decision, we remand the case for clarification. We mean to express no opinion on the merits. Rather, we are remanding the case because we cannot meaningfully review the Board's decision as it now stands.

In 2009 and 2010, the Board received unit clarification petitions from the National Association of Broadcast Employees & Technicians ("NABET" or the "Union") and several NABET local unions. The petitions requested that the Board clarify that all NBC employees represented by NABET under the parties' 2006-2009 collective bargaining agreement were part of a single, nationwide bargaining unit. The petitions also sought to clarify that any persons assigned to the newly created Content Producer position at NBC were both covered by the agreement and were part of the nationwide bargaining unit. The petitions were consolidated and set for hearing. On October 26, 2011, the Board's Acting Regional Director for Region 2 ("ARD") issued a decision largely granting NABET's unit clarification petitions. He found that all NBC employees represented by the Union were part of one nationwide bargaining unit and that the Content Producer position should be included in that unit. Decision on Unit Clarification Petitions (Oct. 26, 2011), *reprinted in* Joint

Appendix ("J.A.") 548-631 ("*Clarification Decision*"). On September 25, 2013, the Board denied NBC's request for review of the ARD's decision. NBC then declined to bargain over the terms and conditions of employment for Content Producers.

On October 28, 2013, NABET filed unfair labor practice charges against NBC. On April 7, 2014, the Board issued a Decision and Order finding that NBC had violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5), by failing and refusing to recognize and bargain with the Union as the Content Producers' exclusive collective bargaining representative, and by failing to provide the Union with information necessary to the fulfillment of its duties. *NBC Universal, Inc.*, 360 N.L.R.B. No. 69 (Apr. 7, 2014) ("*ULP Decision*"). The Board's unfair labor practice findings are largely based on the findings made by the ARD in the *Clarification Decision*. The Company refused to comply with the Board's Order and filed a petition for review with this court.

NBC's principal argument is that the Board erred in adopting the findings of the ARD. NBC contends that the *Clarification Decision* rests on the erroneous conclusion that NABET represents a single, integrated bargaining unit at NBC. According to NBC, Content Producers cannot be added to a consolidated unit that does not exist. We cannot decipher – either from the ARD's decision or the Board's decision adopting the *Clarification Decision* – how the Board determined that all NBC employees represented by NABET are part of a single, nationwide bargaining unit. The conclusion may or may not be right, but the reasoning supporting the Board's judgment – in particular, the ARD's application of Board precedent – is incomprehensible. When an agency's decision lacks adequate justification because it is

neither logical nor rational, or because it fails to offer a coherent explanation of agency precedent, the judgment under review is wanting for lack of reasoned decisionmaking. *See, e.g.*, *Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012). In these circumstances, we are constrained to remand the case to the Board for further consideration and an opportunity to explain the rationale supporting its judgment in a fashion that is consistent with reasoned decisionmaking.

## I. BACKGROUND

### A. Creation of the Content Producer Position

The dispute in this case is a by-product of actions taken by NBC in 2008 and 2009 to reorganize its production methods. That reorganization resulted in the shift of work previously assigned to employees working in positions covered by the parties' collective bargaining agreement to the Content Producer position, which, at least as conceived by NBC, was not a bargaining unit position.

Creation of the Content Producer position was a critical part of NBC's overhaul of the news creation and delivery systems at its local television stations. The Company implemented its new model in "Content Centers" at local NBC stations in New York, Chicago, and Los Angeles. The initiative, which involved the creation of new job classifications and the integration of new technology into newly reorganized work spaces, facilitated a significant shift in editorial focus from the production of broadcast television news to the production of news content appropriate for multiple platforms, including internet, cable, mobile devices, and taxi-casts. NBC also created a Content Center in Washington, D.C., but NABET representation of the Content Producers at that location is not at issue here.

Before the reorganization, various producers oversaw and coordinated the production of broadcast news stories. These producers worked closely with Camera Operators and Video Editors to shoot, select, and assemble visual and audio materials, and with Newswriters to create scripts. The Camera Operators, Editors, and Newswriters were indisputably covered by the 2006-2009 collective bargaining agreement executed by NBC and NABET. Producers, however, were excluded.

According to the job description posted by NBC, persons assigned to the newly created Content Producer position "'desktop edit, write, produce and gather content on all . . . platforms' and are 'responsible for the overall coverage of assigned stories on all platforms throughout the day.'" *Clarification Decision* at 27, J.A. 574 (quoting Content Producer Job Posting, *reprinted in* J.A. 521). And, according to NBC's Vice President of News and Content, Content Producers have "'ownership of a story' which 'could include pitching an idea, it could include setting up the story; who's going to be interviewed, . . . [i]t could include going an [sic] shooting the interview and the pictures for the story . . . [w]riting the story, editing the story, writing the anchor intro and tag for the story, creating a web version of the story, pitching a taxi-cast iteration of the story.'" *Id.* (alterations and ellipses in original) (quoting Transcript of Hearing 350 (testimony of Vickie Burns, NBC Vice President of News and Content), *reprinted in* J.A. 48).

Thus, while NBC conceived of the Content Producer classification as a non-bargaining unit position, *see* Request for Review by Respondent NBCUniversal Media, LLC 2 (Dec. 15, 2011), *reprinted in* J.A. 637, and Content Producers are responsible for certain conceptual and supervisory tasks

that were performed by non-bargaining unit producers before the Company's reorganization, the position also includes bargaining unit work traditionally performed by Editors, Camera Operators, and Newswriters. And it is undisputed that the number of Editor and Newswriter positions at NBC's local stations decreased dramatically, sometimes altogether disappearing, as a result of the Company's reorganization and creation of the Content Producer positions. Indeed, NBC actually recruited and hired a number of Content Producers from within the ranks of its existing Editors and Newswriters.

## B.  The Collective Bargaining Agreement

The Union and NBC have negotiated numerous collective bargaining agreements during the course of their nearly 70-year relationship. The agreement at issue in this case is the NABET-CWA NBCU Master Agreement 2006-2009 ("*Master Agreement*"), *reprinted in* J.A. 206-519, which took effect on April 1, 2006, and expired on March 31, 2009.

The *Master Agreement* covers various job classifications at NBC-owned stations in New York, Chicago, Los Angeles, and Washington, D.C., and it explicitly states that the parties' contract is "between NBC Universal, Inc., as the owner and operator" of the covered TV and radio operations, "and the National Association of Broadcast Employees and Technicians, the Broadcasting and Cable Television Workers Sector of the Communications Workers of America." *Master Agreement* at 1, J.A. 215. Neither NABET local unions nor any other unions are referenced in the *Master Agreement*.

The structure of the *Master Agreement* plays a pivotal role in the parties' dispute over whether it is meant to cover one nationwide bargaining unit. The preamble to the *Master Agreement* says that "the intent and purpose of the parties [is]

to set forth . . . the basic collective bargaining agreements between [them] in two (2) parts." *Id.* Those parts consist of:

> (I) GENERAL ARTICLES covering those subjects which are uniformly applicable to substantially all of the basic relationships, hours of work and general conditions of employment, including a procedure for prompt, equitable adjustment of grievances to the end that there shall be no work stoppages or other interferences with operations during the life of these Agreements; and

> (II) INDIVIDUAL ARTICLES which will contain the description of each bargaining unit, which shall not be affected hereby, the rates of pay and any unusual working conditions which have no general application.

*Id.* The preamble also provides that, "[i]n the event of any conflict between the General and Individual Articles, the Individual Articles will prevail." *Id.*

In addition to 26 General Articles and 15 Individual Articles (each titled "Agreement" in the Table of Contents), the *Master Agreement* contains numerous "Sideletters" that supplement or modify the General and Individual Articles.

The only signatories to the *Master Agreement* are NABET's President, John Clark, and NBC's former Senior Vice President of Labor Relations and Talent Negotiations, Day Krolik. *Id.* at 57, J.A. 271. Their signatures appear at the end of the General Articles. The Individual Articles and Sideletters are not separately signed. And there is no evidence that any NBC representatives of local stations or officials of NABET local unions signed the *Master Agreement*.

The first of the General Articles, Article I Recognition and Warranty, provides:

> The Union represents and warrants, and it is of the essence hereof, that it represents for collective bargaining purposes all of the employees of the Company as defined in the applicable SCOPE OF UNIT clause, and the Company recognizes the Union as the exclusive bargaining agent for all such employees of the Company.

*Id.* at 1, J.A. 215. As noted in the preamble, the remainder of the General Articles describe matters applicable to all employees covered by the *Master Agreement*, including, *inter alia*, work schedules and overtime; seniority, layoffs, and rehiring; leaves of absence; discharges; severance pay; vacations; and grievances and arbitration.

The Individual Articles, together, identify all of the job classifications or positions covered by the *Master Agreement*. Individually, each Article describes the various wage rates agreed to for the positions identified therein and any unusual working conditions specific to those positions. With the exceptions of Individual Article A (which encompasses all of the many covered engineering and technical positions regardless of location) and Individual Article D (which covers "new businesses," i.e., positions involving new work not previously associated with a job classification), each Individual Article covers positions specific to a particular city. For example, Newswriters in Chicago, Los Angeles and New York are covered by Individual Articles H, M, and N, respectively.

Some Individual Articles encompass many job classifications, and some only one. Eleven of the fifteen

Individual Articles identify the positions or job classifications covered in a subsection titled "Scope of Unit." Four Individual Articles do not contain Scope of Unit sections. One of those, Individual Article D, as noted above, covers positions involving new work not previously associated with a job classification. The remaining three indicate (via an incorporated Sideletter or agreement) that the job positions previously identified in each had either been moved into Individual Article A or eliminated as identifiable positions subject to bargaining. Throughout the *Master Agreement*, "unit," "units," "each bargaining unit," and "any unit" frequently stand in for or are used to reference groups of job classifications identified in each Individual Article.

There are three job classifications relevant to the Content Producer position at issue here: Video Editor and Camera Operator – both of which are covered by Individual Article A – and Newswriter, a position covered by Individual Article N for New York, H for Chicago, and M for Los Angeles.

## C. Procedural Background

On September 19, 2008, as NBC was preparing to establish the first Content Center at WNBC New York, the Company and NABET Local 11 entered into a written agreement providing that, except for employees who had occupied NABET-represented jobs and who chose to remain represented by the Union, Content Producers at WNBC would not be covered by the *Master Agreement*. *See* Agreement (Sept. 19, 2008), *reprinted in* J.A. 522-24. The agreement also stated that the Union "agrees that it will make no claims to represent any non-NABET-represented Content Producers employed by WNBC except in the event such employees elect NABET-CWA as their bargaining agent in an election supervised by the NLRB." *Id.* at 3, J.A. 524.

When NBC launched the Content Centers in Chicago and Los Angeles, NABET locals in those cities refused to sign agreements similar to the one signed by Local 11. Instead, the Union and its locals (including Local 11) filed unfair labor practice charges, as well as the petitions for clarification at issue here. After initially pursuing the unfair labor practice charges against NBC, the Board reversed the order of the proceedings, held the unfair labor practice charges in abeyance, and informed the parties that it would proceed with the unit clarification petitions. *See* Request for Review by Respondent NBCUniversal, LLC 2-4, J.A. 637-39.

The Board subsequently consolidated the clarification petitions, and a Board hearing officer took testimony over the course of several weeks during a two-month period. On the basis of that testimony, accompanying exhibits, and post-hearing briefs, the ARD for Region 2 issued the *Clarification Decision* that the Board adopted in its subsequent *ULP Decision.*

Before the ARD, the principal arguments advanced by NABET and NBC were largely premised on their differing views as to whether the NABET employees covered by the 2006-2009 *Master Agreement* belonged to a single, nationwide bargaining unit, as NABET contended, or twelve separate bargaining units defined by the Individual Articles, as NBC asserted. *See Clarification Decision* at 54, J.A. 601. NABET argued that if covered employees belonged to a single, nationwide unit, application of the "same basic functions" standard of *Premcor, Inc.*, 333 N.L.R.B. 1365 (2001), was appropriate and would support a finding that Content Producers belonged within the unit. *See Clarification Decision* at 2, 67-68, J.A. 549, 614-15. NBC argued that the "community-of-interest" accretion standard applied and,

under that standard, the Content Producer position could not be added to any of the extant bargaining units. *See id.*

The ARD resolved the unit clarification question in NABET's favor, finding that all employees covered by the *Master Agreement* constituted a single unit. In determining which standard to apply to that single unit – the *Premcor* analysis or the community-of-interest accretion analysis – the ARD "recognize[d] that the instant case differs from *Premcor*, in part because the Content Producers have some responsibilities that do not appear to have been previously performed by bargaining unit employees." *Id.* at 70, J.A. 617. Nonetheless, the ARD found that *Premcor* provided the most appropriate standard, explaining:

> [A]pplication of a traditional accretion analysis here is problematic in light of [NBC's] contention that such an analysis cannot compare the Content Producers with bargaining unit classifications that no longer exist. Clearly, "community of interest" factors such as interchange between unit employees and the new classification, supervision, and even functional integration, are rendered meaningless, or in any case are substantially compromised, in circumstances where the most relevant bargaining unit classifications, here Newswriters and Editors, have been eliminated as a result of the very change in [NBC's] operations that produced the new classification. This was the case in *Premcor*, and it is also the case here.

*Id.*

The ARD additionally rejected NBC's argument that the agreement signed by Local 11 was binding on NABET with respect to Content Producers in New York. *Id.* at 62, J.A. 609.

On this point, the ARD found that "[t]here is nothing in the NABET-CWA By-Laws tending to establish that Local Union Presidents have authority to sign agreements with the Employer concerning who will and will not fall within the Union's representation." *Id.* The ARD further found that "there is no evidence that NABET-CWA President Clark even knew of Local 11 President McEwan's negotiations with the Employer, let alone designated Local 11 President McEwan to negotiate in regard to the representation of the New York Content Producers on the [sic] his behalf. . . . In short, there is no evidence to warrant the conclusion that Mr. McEwan had actual or apparent authority to bind the [Union] in regard to the unit placement of the Content Producers." *Id.* at 63, J.A. 610.

NBC sought Board review of the ARD's *Clarification Decision*. The Board declined. *See NBC Universal, Inc.*, 02-UC-000619 et al. (Sept. 25, 2013), *reprinted in* J.A. 677. And when NABET subsequently sought bargaining information regarding the Content Producer position and attempted to bargain with NBC over the position, NBC refused on the ground that the *Clarification Decision* was wrongly decided. NABET then filed unfair labor practice charges and, when NBC persisted in refusing to bargain, the Board issued a complaint on those charges. The Board's General Counsel filed a motion for summary judgment. NBC responded, again arguing for review and reversal of the *Clarification Decision*.

On April 7, 2014, the Board issued the *ULP Decision* at issue here. Without elaboration, the Board adopted the ARD's *Clarification Decision*, stating:

> The employees described in the scope of unit clauses of the individual articles of the most recent master agreement between the Respondent and the Union . . .

constitute a unit appropriate for the purposes of collective bargaining . . . within the meaning of Section 9(b) of the Act[, 29 U.S.C. 159(b)].

*ULP Decision*, 360 N.L.R.B. No. 69 at 2. Using similarly concise language, the Board also adopted the ARD's conclusion "that [NBC's] newly created position of content producer at [its] New York, Chicago, and Los Angeles owned and operated local stations was properly included in the unit." *Id.* Finally, describing the correspondence between the parties regarding NBC's refusal to provide information and bargain, the Board concluded that NBC was engaging in unfair labor practices, granted summary judgment against the Company, and ordered NBC to recognize, provide information to, and bargain with NABET. *See id.* at 2-4.

NBC refused to comply with the Board's order, and petitioned this court for review. The Board cross-petitioned for enforcement. This court has jurisdiction under sections 10(e) and (f) of the National Labor Relations Act. 29 U.S.C. § 160(e) and (f).

## II. DISCUSSION

NBC does not dispute that it refused to bargain with NABET over the Content Producer position and that it also refused to provide the Union with information about the new job classification. In addition, the Company does not now contest that if the *Master Agreement* encompasses a single, nationwide bargaining unit, then the *Premcor* standard would apply to determine whether the Content Producer position is within the unit.

NBC's principal claim is that the Board's *ULP Decision* must be overturned because it rests on a flawed *Clarification*

*Decision*. In the Company's view, the ARD erred in ignoring and misreading clear and unambiguous language in the parties' *Master Agreement*, relying on extrinsic evidence, misconstruing the history of the parties' bargaining relationship, and failing to properly consider and apply Board precedent. The gravamen of NBC's argument is that the ARD improperly looked beyond the words of the M*aster Agreement* in determining whether employees covered by it belonged to a single, nationwide bargaining unit or to multiple individual units, and that he drew the wrong conclusion from the extrinsic evidence that he considered.

## A.   Standard of Review

The National Labor Relations Act delegates to the NLRB the authority to "decide . . . whether, in order to assure to employees the fullest freedom in exercising the[ir] rights[,] . . . the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." 29 U.S.C. § 159(b). The Supreme Court long ago recognized that the Board's "broad" discretion in this area "reflect[s] Congress' recognition 'of the need for flexibility in shaping the [bargaining] unit to the particular case.'" *NLRB v. Action Auto., Inc.*, 469 U.S. 490, 494 (1985) (quoting *NLRB v. Hearst Publ'ns, Inc.*, 322 U.S. 111, 134 (1944)). The "wide deference" afforded the Board in its unit determinations also reflects the reality that each decision rests on "a fact-intensive inquiry and a balancing of various factors." *United Food & Commercial Workers, Local 540* v. *NLRB*, 519 F.3d 490, 494 (D.C. Cir. 2008) (citation omitted); *see also Dodge of Naperville, Inc. v. NLRB*, 796 F.3d 31, 38 (D.C. Cir. 2015).

Because unit determinations involve such "a large measure of informed discretion," a Board decision, "if not

final, is rarely to be disturbed." *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 491 (1947). Congress has "delegate[d] to the Board the responsibility to make a reasonable determination supported by its own precedent and evidence in the record. That this Court, or other reasonable people, may prefer a bargaining unit with different contours is immaterial as a reviewing court may not substitute its own judgment for a rationally supported position adopted by the Board." *Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1189, (D.C. Cir. 2000) (citation omitted). In other words, we must uphold a unit determination if it is supported by substantial evidence, 29 U.S.C. § 160(e)-(f), and is "rational and in accord with past precedent," *Int'l Union of Elec., Radio & Mach. Workers*, 604 F.2d 689, 695 (D.C. Cir. 1979).

The deference we owe the Board in determining the appropriate size of a bargaining unit prevents us from reviewing a Board determination on any rationale other than the one supplied in its decision and order. *See Point Park Univ. v. NLRB*, 457 F.3d 42, 49-50 (D.C. Cir. 2006). When we cannot discern that rationale, we are in no better a position than when the Board is silent. We cannot guess at what the Board means to say for to do so would result in the court improperly filling critical gaps in the Board's reasoning and perhaps sustaining the Board's action on a ground that the Board did not intend – something which is prohibited. *See id.* at 50 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947)). In such situations, remand of the case for clarification is a prerequisite to meaningful judicial review. *See Point Park Univ.*, 457 F.3d at 51; *see also Detroit Newspaper Agency v. NLRB*, 435 F.3d 302, 304-05 (D.C. Cir. 2006) (stating that in the unlawful discharge context, "where we cannot discern the precise basis upon which the Board rested in reaching its conclusion, meaningful judicial review

requires us to remand the case to the Board for clarification") (ellipsis, alteration, and citation omitted).

## B. The ARD's *Clarification Decision*

In analyzing whether employees represented by NABET are part of a single, nationwide bargaining unit, the *Clarification Decision* purports to apply or distinguish five Board decisions. However, we are unable to follow the thread of the decision's reasoning at a number of critical points. Most fundamentally, we are unable to discern the factual and precedential bases for the ARD's rigidly bifurcated approach to assessing when and how to focus on the terms of the *Master Agreement*, the structure of the agreement, and the parties' bargaining history in a unit clarification proceeding.

As an initial matter, it is noteworthy that the *Clarification Decision* says that because "[n]either party has introduced the certification(s) of representation, which presumably would contain a clear statement of the unit or units for which the Union has been certified as the exclusive collective-bargaining representative. . . . the parties' agreement governs the scope of the unit." *Clarification Decision* at 54-55, J.A. 601-02 (citing *La. Dock Co.*, 293 N.L.R.B. 233 (1989), *enf't. denied on other grounds*, 909 F.2d 281 (7th Cir. 1990)). The ensuing discussion of this point is garbled, to say the least.

Specifically, we do not know what to make of the ARD's footnoted acknowledgment that NABET did, in fact, point to a Board decision *certifying* it as the representative of a nationwide unit of NBC engineering and technical employees. *See Clarification Decision* at 54 n.82, J.A. 601-02 (citing *Nat'l Ass'n of Broad. Eng'rs & Technicians*, 59 N.L.R.B. 478 (1944)). The ARD says that this "tends to support the

Employer's position that there exist multiple units, [but] the case is not conclusive." *Id.* The ARD then points out that

> the Board has found that even where parties have initially treated a group of employees at a particular location as a separate unit, the parties may subsequently establish a single national unit by a practice of joint bargaining, repeated negotiation of a national agreement, and other indicators of such intention. *See Columbia Broadcasting System, Inc*., 208 NLRB 825 (1974).

*Clarification Decision* at 54 n.82, J.A. 602. This line of analysis is unilluminating because the *Columbia Broadcasting System* ("*CBS*") case involved a situation in which the company and union established a bargaining relationship pursuant to voluntary recognition. To make matters worse, the ARD then states that, in this case, "it is unclear" whether "(any of) the asserted unit(s) here" were established pursuant to voluntary recognition. *Id.* at 54 n.83, J.A. 602. And the ARD does not explain whether this has a bearing on the unit clarification issue.

We are thus at a loss to understand the Board's view of the effect of either the certification decision proffered by NABET or the apparently indeterminate state of the record with respect to agreements negotiated pursuant to voluntary recognition. And the *Clarification Decision* offers no useful analytical framework.

In addition, we are unable to understand the precedential basis for the ARD's two-step, bifurcated approach to determining the appropriate unit in a unit clarification proceeding. Under the ARD's approach, the parties' history of collective bargaining and the structure of their agreement are

not relevant unless the Board first finds that the literal terms of the contract are ambiguous. We find little support in the Board's decisions for this bifurcated analysis.

It is true that in *Louisiana Dock*, the Board, citing *Sambo's Restaurants, Inc.,* 212 N.L.R.B. 788 (1974), said: "When there is no clear and unambiguous contract provision setting forth the parties' agreement, it may be evidenced by bargaining history or a pattern of bargaining." 293 N.L.R.B. at 234. However, the wholistic approach generally followed by the Board in cases involving "master agreements" suggests that the statement in *Louisiana Dock* may be permissive (indicating how "bargaining history" may be useful), and not restrictive as the ARD thought.

There is no doubt here that the *Master Agreement* covers all of the groups of job classifications identified in the Individual Articles. This case is thus plainly distinguishable from unit clarification cases in which the reach of the parties' agreement is in dispute. *See, e.g.*, *Commonwealth Comm'ns, Inc. v. NLRB*, 312 F.3d 465, 468 (D.C. Cir. 2002). The question here is not whether the *Master Agreement* reaches all of the positions identified in the Individual Articles; rather, the issue is whether each group identified in the Individual Articles is a separate bargaining unit or whether all of the positions covered by the *Master Agreement* constitute one nationwide bargaining unit. Obviously, the structure of the *Master Agreement* and the parties' bargaining history may be highly relevant to the latter inquiry.

*Sambo's Restaurants*, on which the ARD rests his approach, surely does not make textual ambiguity a prerequisite to examination of the parties' bargaining history. In that decision, the Board acknowledged the persuasive support in the collective bargaining history for a multi-store

unit. *See* 212 N.L.R.B. at 788. It concluded, however, that the support was undermined by a letter written by the union during the course of collective bargaining negotiations with the employer. *See id.* The Board never suggested that ambiguity in the language of the collective bargaining agreements was a prerequisite to its review of the parties' bargaining history.

*Columbia Broadcasting Systems*, 208 N.L.R.B. 825 (1974), even more explicitly rejects the ARD's bifurcated approach. That decision involved a master agreement that, similar to the one at issue here, consisted of a national agreement and local supplements. The national agreement contained language that the Board characterized as "clearly indicat[ing]" an "expressed intention of recognizing one comprehensive unit." *Id.* at 826 & n.10. Nonetheless, the Board undertook a detailed examination of the parties' collective bargaining history and put great weight on that history in finding the existence of a single unit. *See id.* at 825-26 & n.10. Moreover, the Board laid out a number of factors which it characterized as relevant to determining whether "the scope and nature of the local bargaining and the resulting local supplements to the national agreement are not so substantial as to defeat" the finding of a national bargaining unit. *See id.* at 826. Those factors variously involved the language, structure, and history of the collective bargaining agreement. *See id.* And there was no suggestion that the factors pertaining to the language of an agreement must be examined and ambiguity found before evidence of the parties' bargaining history or the structure of the agreement can be considered. *See id.*

Moreover, in neither *National Broadcasting Co.* ("*NBC*"), 114 N.L.R.B. 1 (1955), nor *American Broadcasting Co.* ("*ABC*"), 114 N.L.R.B. 7 (1955), did the Board make

ambiguity in the language of the collective bargaining agreement a prerequisite to consideration of the parties' bargaining history. In *NBC*, the Board first noted the course of the relationship between the parties prior to the execution of the master agreement at issue. *See NBC*, 114 N.L.R.B. at 2. It then detailed the language of the master agreement. *See id.* at 2-4. Finally, it weighed that language (which the Board concluded supported a finding that the master agreement covered multiple, individual bargaining units) against the testimony describing a post-agreement course of collective bargaining that NABET argued supported a finding of a single unit. *See id.* at 2, 4-5. In identifying the appropriate unit, the Board reviewed the language of the relevant general and individual articles in detail and rested particularly on the language setting forth the purpose and intent of the parties. *See id.* at 4. But it also considered the evidence of bargaining history. *See id.* at 4-5.

Following a similar course of analysis, the Board in *ABC* first considered the evolution of the parties' relationship from consent agreement to initial contract and from initial contract to the collective bargaining agreement at issue. *See ABC*, 114 N.L.R.B. at 9. After describing the provisions of that "Master Contract" in some detail, the Board turned to evidence showing that the employer was administering the master contract on the basis of separate units and that the parties had bargained on the basis of separate units. *See id.* In view of the entire record, the Board found that the history of bargaining for the employees at issue had been on the basis of a separate unit, previously certified by the Board. *See id.* Again, there was no suggestion that the Board looked at the evidence of the collective bargaining history only because the language of the Master Contract was ambiguous.

The Board's wholistic approach to the record in *ABC* and *NBC* is hardly surprising given the reliance of both decisions on *American Can Co.*, 109 N.L.R.B. 1284 (1954). *See ABC*, 114 N.L.R.B. at 9 n.2; *NBC*, 114 N.L.R.B. at 4 n.1. In *American Can*, the Board was explicit in examining both the language of the relevant agreements and the evidence of the parties' interactions as evidence of "bargaining history," 109 N.L.R.B. at 1285, bearing on whether multiple plants covered by the "basic" (or master) contract should be treated as one or multiple collective bargaining units. *See id.* at 1285-88. Setting the pattern for *ABC* and *NBC*, the Board considered evidence of the past and current relationship between the union and the company, as well as the details of both the language and structure of past contracts and the contract at issue. *See id.* Based on all of those factors, the Board found that there was "no unequivocal manifestation of an intent" to create a multi-plant bargaining unit. *Id.* at 1288.

In light of these decisions, it seems that the ARD's bifurcated approach may be attributable to a misreading of *Louisiana Dock* and a failure to take account of other Board precedent. We cannot be sure what the Board meant to say, however, because it simply adopted the *Clarification Decision* without amplification. Thus, we will leave this matter for the Board to address on remand.

Upon finding that the *Master Agreement* was "contradictory and thus ambiguous as to the existence of a single or multiple units," the ARD turned to the "extrinsic evidence bearing on the single unit/multiple units question." *Clarification Decision* at 56, J.A. 603. He pointed to the fact that only the General Articles of the *Master Agreement* were signed and that the only signatories were John Clark (President of the Union) and Day Krolik (NBC's Senior Vice President of Labor Relations and Talent Negotiations). *See id.*

at 56-57, J.A. 603-04. The ARD explained that while each Individual Article had its own ratification process, ratification of the entire agreement and ratification of the Individual Articles were not independent procedures. *See id.* at 56, J.A. 603. He also noted that there was no indication in the record that the Individual Articles were negotiated "separately, at a different time, or by different representatives than those who negotiated the Master Agreement." *Id.* And he observed that "[t]here is no indication that the Local Union representatives on the negotiating committee are currently or have in the past negotiated collective-bargaining agreements or even sub-agreements such as those contained in the Master Agreement independently in regard to the 'unit' of employees within their geographic area of responsibility." *Id.* at 57, J.A. 604. Finally, citing *CBS* and contrasting *NBC*, he concluded that "the mere existence of supplemental agreements covering specific groupings of employees does not undercut the existence of a single unit where the parties' course of conduct otherwise supports a single unit. *See Columbia Broadcasting Systems, Inc.*, 208 NLRB at 826; *but see National Broadcasting Company, Inc.*, 114 NLRB 1, 2 (1955)." *Clarification Decision* at 57, J.A. 604. We find it difficult to understand how the ARD meant to apply *CBS* and *NBC* to his factual findings.

The statement of law attributed to *CBS* is correct, as far as it goes. But critically, the ARD fails to address the factors that *CBS* describes as relevant to determining whether the nature of bargaining and the resulting supplements to a national agreement are so substantial as to defeat the conclusion that a national unit has been agreed upon. *See CBS*, 208 N.L.R.B. at 826. Were it our place to guess, we would still be at a loss to comprehend the ARD's findings because the *CBS* factors point in different directions. One factor cited as undermining a potential finding that the parties' course of conduct supports

a nationwide unit is a "reference in the master agreements to 'units' with inclusion of a description of each 'plant unit.'" *Id.* This favors NBC in this case. However, another factor is the "existence of separate agreements with no master agreement." *Id.* This favors NABET in this case.

With respect to the first factor, the references in the NABET-NBC *Master Agreement* to "units" and the Scope of Unit provisions in each Individual Article suggest that the ARD's conclusion that the parties' course of conduct supported a nationwide unit may be undermined. However, because the NABET-NBC collective bargaining agreement is structured as a master agreement consisting of general and individual articles, application of the second factor supports the conclusion that the negotiations for the Individual Articles did not undermine the ARD's conclusion. This may be particularly so because it is not clear that the Individual Articles here can be characterized as "separate agreements," as that term is used in *CBS*. They are not separately signed and do not take effect absent ratification of the General Articles.

If the Board is to be true to its precedent, we believe the *CBS* factors must be addressed. And given the fact that they seem to point toward inconsistent outcomes, we think the deference we owe the Board weighs in favor of allowing the Board to explain whether the *CBS* factors are as relevant as they appear to be and, if so, to apply the factors in the first instance.

We also find confusing the ARD's attempt to distinguish the Board's 1955 decision in *NBC*. This decision is obviously significant because the NABET-NBC collective bargaining agreement in force in 1955 was identically structured to the one here, and it contained a number of identical provisions.

The question in *NBC* was whether the Los Angeles film group (which was the subject of an Individual Article) had, over the course of collective bargaining, been made part of a single, nationwide unit. *See* 114 N.L.R.B. at 2. As a predicate to that assessment, the Board concluded that the other groups of employees covered by the NABET-NBC agreement did not constitute a single nationwide unit. *See id.* at 2-5.

In an attempt to distinguish *NBC*, the ARD states that the Board relied on the testimony of NABET's attorney "that, following the certification of [NABET] as the exclusive representative of [the Los Angeles film service] employees, the parties had agreed that the collective-bargaining agreement covering them would be added to the master agreement and that bargaining thereafter would be done in conjunction with nationwide negotiations." *Clarification Decision* at 57 n.87, J.A. 604. The ARD notes that "[i]n this context, the Board viewed the mere fact of nationwide negotiations as insufficient to undercut the initial intent of the parties that the Los Angeles 'film service' employees would exist as a separate unit." *Id.* The *Clarification Decision* concludes that "[t]here is no comparable evidence here." *Id.*

Try as we might, we cannot discern with any certainty how the ARD meant to distinguish *NBC*. We can guess that the "comparable evidence" to which he refers is the certification of the Los Angeles film service employees. But we are not at all sure that this is what he intended. And if it is, then, as earlier indicated, we wonder how the evidence of certification that the ARD dismissed out-of-hand should be considered. On remand, the Board must address *NBC*, and it must do so in a way that makes more sense than does the *Clarification Decision*.

Based on *American Can*, *NBC*, *ABC*, and *CBS*, it appears that when a unit clarification proceeding involves a "master agreement" covering a number of divisions of a company, the parties' bargaining history and the structure of their agreement are always relevant. If that is the case, then the Board's 1955 decision in *NBC*, while undeniably relevant, is not likely dispositive. There has been too much bargaining history during the decades since that decision issued to treat it as the final word in a unit clarification proceeding focused on the 2006-2009 *Master Agreement*. Just the fact that in 1955 the Board had only 14 years of collective bargaining history to consider, *see NBC*, 114 N.L.R.B. at 2, whereas now it has 75 years, may be enough for the Board to conclude that the 1955 decision is not controlling.

## III. CONCLUSION

We deny both the petition for review and the Board's cross-application for enforcement and remand the case for clarification consistent with this opinion. The Board adopted the ARD's *Clarification Decision* without explanation or elaboration. Because we cannot discern how the *Clarification Decision* applies relevant Board precedent to the facts of this case, we are constrained to remand the case to the Board. On remand, the Board must explain both the principles embodied in the relevant precedent and how application of those principles to the facts here supports its resolution of the parties' dispute. In addition to resolving the unit clarification issue, the Board must also address the parties' dispute over the Local 11 agreement. The resolution of the Local 11 issue may depend in part on how the Board resolves the unit clarification issue. We leave this matter to the Board to address in the first instance. Nothing in this decision is meant to foreclose the Board from reopening the hearing record in

the event that it determines that additional evidence and argument are necessary to reach an informed judgment in this case.

*So ordered.*