# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 4, 2017          Decided August 4, 2017

No. 16-1265

OBERTHUR TECHNOLOGIES OF AMERICA CORPORATION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

GRAPHIC COMMUNICATIONS CONFERENCE, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, LOCAL 14M,
INTERVENOR

———

Consolidated with 16-1330, 16-1331

———

On Petition for Review,
Cross-Application for Enforcement of an Order
of the National Labor Relations Board, and Application for
Enforcement of a Second Order

———

*Kevin C. McCormick* argued the cause for petitioner. With him on the briefs was *Thomas C. Mugavero*.

*Michael R. Hickson*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, General Counsel, *John H. Ferguson*,

Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Jennifer Abruzzo*, Deputy General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Oberthur Technologies of America seeks review of orders and a certification decision issued by the National Labor Relations Board. Following a representation election, the Board certified International Brotherhood of Teamsters, Local 14M as the collective bargaining representative of a group of Oberthur employees. The Board also found that the company violated the National Labor Relations Act before the election by restricting employee speech and freezing employee wage benefits. In its petition for review, Oberthur challenges the Board's findings of pre-election unfair labor practices and raises objections to the representation election. For the reasons set forth below, we deny Oberthur's petition for review and grant the Board's applications for enforcement.

I

Oberthur manufactures credit cards, debit cards, governmental identification cards, and related products at its facility in Exton, Pennsylvania. In the spring of 2012, Teamsters' Local 14M commenced an organizing campaign at the Exton plant. During the campaign, the company banned all union-related speech on the plant floor and put a freeze on two longstanding employee wage benefit programs. The union subsequently filed unfair labor practice charges against the company.

On July 30, 2012, the union filed a petition with the Board seeking a representation election. In early August, the parties reached a Stipulated Election Agreement. The Agreement provided for a secret-ballot election and defined the relevant bargaining unit as covering "[a]ll full-time employees" working in fifteen specified departments at the Exton plant. Stipulated Election Agreement (Aug. 8, 2012) (J.A. 91). Under the Agreement, the parties waived their rights to a hearing, agreed that the Board's regional director, who approved the agreement, would supervise the election, and agreed that all post-election procedures would conform with the Board's rules and regulations.

The election took place on September 7, 2012. Oberthur declined to challenge any ballots or otherwise contest the validity of the representation election. As relevant here, however, the union challenged the ballots cast by two engineers -- John DiTore and Birendra Sahijwana -- on the ground that they qualified as "professional employees" under National Labor Relations Act (NLRA) § 9(b), 29 U.S.C. § 159(b), and were thus excluded from the unit. The two ballots were impounded in accordance with Board regulations. *See* 29 C.F.R. § 102.69(a). The final tally of the non-impounded ballots showed that the union prevailed by a narrow, two-vote margin of victory: 108 votes in favor to 106 votes against. Tally of Ballots (Sept. 7, 2012) (J.A. 94). The parties do not dispute that the two ballot challenges at issue in this petition for review could be determinative of the result of the representation election.[1]

---

[1] The union actually made a total of three timely ballot challenges, the third being a challenge to the ballot cast by Scott Hillman. *See* Notice of Hearing on Challenged Ballots and Objections to Election (Oct. 24, 2012) (J.A. 99). Although the Administrative Law Judge sustained the union's challenges to DiTore and Sahijwana,

In October 2012, the Regional Director consolidated the unfair labor practice charges together with the challenges to the representation election for a hearing before an Administrative Law Judge (ALJ). The ALJ found that the company violated Sections 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1), (3), by restricting union-related speech and by announcing and ultimately enacting a freeze on employee wage benefits. The ALJ also recommended sustaining the union's challenges to the ballots cast by DiTore and Sahijwana upon finding that both engineers qualified as "professional employees" under NLRA § 9(b), 29 U.S.C. § 159(b). Oberthur filed timely exceptions to the ALJ's pre-election unfair labor practice findings and to his decision to sustain the union's challenges to the ballots cast by DiTore and Sahijwana. In addition, in its exceptions to the ALJ's decision, the company raised a new objection for the first time: that even if DiTore and Sahijwana were professional employees, the election should still be set aside on procedural grounds.

The Board issued its opinion on August 27, 2015. With respect to the pre-election unfair labor practice charges, the Board adopted the ALJ's findings that the company violated the NLRA by restricting union-related speech and freezing employee wage benefits. *Oberthur*, 362 N.L.R.B. No. 198, at 1 (Aug. 27, 2015) (2015 Board Order). It directed Oberthur to rescind its restriction on union-related speech and make its employees whole for any losses stemming from the freeze on

---

he recommended that the Board overrule the union's challenge to Hillman. *Oberthur Technologies of Am. Corp.*, 362 N.L.R.B. No. 198, at 13 (Feb. 20, 2013) (ALJ Op.). The Board concluded that Hillman's ballot "is not determinative and will not be opened or counted." *Id.* at 2 & n.6 (Aug. 27, 2015) (2015 Board Order). In light of our resolution of the challenges to the other two ballots, we reach the same conclusion.

wage benefits. *Id.* at 3-4. With respect to the representation election, the Board adopted the ALJ's recommendation to sustain the union's challenges to the ballots cast by DiTore and Sahijwana. *Id.* at 2-3. It further rejected as untimely and procedurally improper Oberthur's alternative challenge to the validity of the election, *id.* at 3, and certified the union as the exclusive collective-bargaining representative for the stipulated unit of Oberthur employees, *id*. at 4.

Following certification, Oberthur refused to bargain with the union. An employer may, as Oberthur did here, "challenge a certification decision indirectly by refusing to bargain with the union and then raising its election objection in the ensuing unfair labor practice proceedings." *Canadian Am. Oil Co. v. NLRB*, 82 F.3d 469, 471 n.1 (D.C. Cir. 1996); *see* 29 U.S.C. § 160(f). On July 27, 2016, the Board found that Oberthur's refusal to bargain violated NLRA § 8(a)(1) and (5), 29 U.S.C. § 158(a)(1) and (5). *Oberthur Technologies of Am. Corp.*, 364 N.L.R.B. No. 59, at 2-3 (July 27, 2016) (2016 Board Order). Oberthur now seeks review of both the 2015 and 2016 Board Orders. The NLRB applies for enforcement of both.

## II

We first address Oberthur's objection to the Board's findings that it violated the NLRA by restricting employee speech and freezing two longstanding employee wage benefit programs in the lead-up to the September 2012 representation election. 362 N.L.R.B. No. 198, at 1 & 1 nn.4-5 (2015 Board Order).[2] This Court "must uphold the judgment of the Board

---

[2] The Board also found that the company separately violated NLRA § 8(a)(1) by telling employees that the two wage benefit programs were on hold until after the election. *Oberthur*, 362 N.L.R.B. No. 198, at 1 (2015 Board Order). Oberthur argues only

unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Spurlino Materials, LLC v. NLRB*, 805 F.3d 1131, 1136 (D.C. Cir. 2015) (quotation marks omitted); *see* 29 U.S.C. § 160(f) (providing that the Board's findings of fact are "conclusive" if "supported by substantial evidence on the record considered as a whole").

## A

Section 8(a)(1) makes it unlawful for an employer to "interfere with, restrain, or coerce employees" in the exercise of their rights under NLRA § 7, 29 U.S.C. § 157. 29 U.S.C. § 158(a)(1). Section 7's guarantees "'necessarily encompass[]' employees' rights to communicate with one another and with third parties about collective action and organizing a union." *Quicken Loans, Inc. v. NLRB*, 830 F.3d 542, 545 (D.C. Cir. 2016) (quoting *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 491 (1978)). Accordingly, if "considering the totality of the circumstances," an employer's statement "has a reasonable tendency to coerce or to interfere with" an employee's Section 7 right to communicate about the union, the statement violates Section 8(a)(1). *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001) (citing *Avecor, Inc. v. NLRB*, 931 F.2d 924, 931 (D.C. Cir. 1991)).

---

that, "[t]o the extent that" the pre-election freeze "did not violate the Act, . . . the mere act of telling employees about a (lawful) policy cannot itself be a violation." Oberthur Reply Br. 24. Because we find that the pre-election freeze did violate the Act, and because Oberthur does not challenge the separate § 8(a)(1) violation under those circumstances, the Board is entitled to summary enforcement with respect to that violation. *See generally Allied Mech. Servs. v. NLRB*, 668 F.3d 758, 765 (D.C. Cir. 2012).

It is well established that an employer's warning directing employees to "cease Union-related discussions only" constitutes a Section 8(a)(1) violation. *ITT Industries, Inc. v. NLRB*, 251 F.3d 995, 1006 (D.C. Cir. 2001). And while non-solicitation rules designed to advance legitimate business interests in employee discipline and productivity are permissible, "[a]n employer violates the Act when employees are forbidden to discuss unionization, but are free to discuss other subjects unrelated to work." *Oberthur*, 362 N.L.R.B. No. 198, at 1 & n.4 (2015 Board Order) (quoting *Jensen Enterprises, Inc.*, 399 N.L.R.B. 877, 878 (2003)).[3]

Oberthur contests the Board's finding that it violated Section 8(a)(1) by imposing a "discriminatory restriction on union-related speech." 362 N.L.R.B. No. 198, at 1 & n.4 (citing *Jensen Enterprises, Inc.*, 339 N.L.R.B. at 878). We are unpersuaded. The Board adopted the ALJ's findings on this issue, which pointed to statements by shift supervisor Frank Belcher, who told employees "that discussions about the union or organizing had to take place in common areas, not work areas." Belcher Aff. (J.A. 1171); *see* Belcher Testimony (J.A. 559). The ALJ found and Oberthur concedes that the company did not impose similar restrictions on discussions about non-union subjects. *See* 362 N.L.R.B. No. 198, at 10 & n.7 (ALJ Op.); Oral Arg. Recording at 6:57. Indeed, Belcher testified that

---

[3] *Cf. Our Way, Inc.*, 268 N.L.R.B. 394, 394 (1983) (stating that there would be no violation if the employer barred "solicitation for any cause, or distribution of literature of any kind, during working time"); *F.P. Adams Co., Inc.*, 166 N.L.R.B. 967, 967 (1967) (finding no violation when the employer said that "talk about the Dodgers or the Angels, whichever your favorite baseball team may be, or about anything else" non-work-related is permitted only "before or after work, during meal periods and during rest periods" (emphasis omitted)).

discussions of all other topics -- from"[w]eddings [and] funerals" to "football, basketball, [and] vacations" -- were permitted in work areas. Belcher Testimony (J.A. 562). Nor did the company meet its burden of establishing "a legitimate and substantial business justification for the rule, outweighing the adverse effect on the interests of employees." *Banner Health System v. NLRB*, 851 F.3d 35, 41 (D.C. Cir. 2017) (internal quotation marks omitted).

Oberthur further contests the Section 8(a)(1) violation on the ground that "there was no evidence that organizing activity was in any way limited by Belcher's conduct, or that any employees were disciplined." Oberthur Br. 30-31. We have held, however, that the "'mere maintenance of a rule likely to chill section 7 activity, whether explicitly or through reasonable interpretation, can amount to an unfair labor practice even absent evidence of enforcement of the rule by the employer.'" *Banner Health System*, 851 F.3d at 40-41 (quoting *Quicken Loans*, 830 F.3d at 546). "[C]onsidering the totality of the circumstances," there is substantial evidence to support the Board's conclusion that Oberthur's statement "ha[d] a reasonable tendency to coerce or to interfere with" its employees' Section 7 right to communicate about the union, thereby violating Section 8(a)(1). *Tasty Baking Co.*, 254 F.3d at 124.

## B

We turn next to the Board's finding that Oberthur violated Section 8(a)(1) and (3) by implementing a freeze on two longstanding employee wage benefit programs in advance of the representation election. 362 N.L.R.B. No. 198, at 1 & n.5 (2015 Board Order). The company challenges both the Board's unfair labor practice finding and its make-whole remedy.

We begin with the company's challenge to the Board's unfair labor practice finding. "As a general rule, while a union representation proceeding is pending, an employer must decide whether to grant benefits 'precisely as it would if the union were not on the scene.'" *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 927 (D.C. Cir. 2005) (quoting *Perdue Farms, Inc. Cookin' Good Division v. NLRB*, 144 F.3d 830, 836 (D.C. Cir. 1998)). "It follows that an employer may not withhold a wage increase that would have been granted but for a union organizing campaign." *Id*.

In this case, substantial evidence supports the Board's finding that Oberthur violated Section 8(a)(1) and (3) by freezing wage benefits it had granted to its employees through two separate wage benefit programs. The company concedes that under the status quo, it maintained two wage benefit programs: (1) the "Spot Bonuses" program, which rewarded discrete examples of exceptional service with "spot bonuses" ranging between $50 and $150; and (2) the "Wage Increase" program, which rewarded employees for taking on more challenging positions within the company by increasing their base salary over the course of eighteen months to two years. *Oberthur*, 362 N.L.R.B. No. 198, at 11-12 (ALJ Op.). Oberthur further concedes that it froze the benefits "because of the Union organizing campaign." Oberthur Br. 32.

Oberthur acknowledges that its decision to put all spot bonuses and wage increases "on hold" was "memorialized" in an email sent to managers and supervisors by Diane Ware, Oberthur's Human Resources Manager, two days after the union filed its election petition with the Board. Oberthur Reply Br. 22, 25. In the message, Ware instructed Oberthur's managers and supervisors that all wage increases and spot bonuses were on hold, and then gave the following instruction:

> If one of your employees is waiting for an increase - please use the following phrase, "During this period, we have to keep the status quo on all issues related to wages, transfers, and promotions." PLEASE NOTE: We cannot say things like, 'it's because of the union,' or 'your promotion will be processed *once we vote the union down.*' These phrases, although very likely true, will be viewed as a promise and we need to make sure that doesn't happen. *Hopefully,* with the phrase, 'during this period,' *employees will realize that it may be linked to unions*, but we cannot draw that conclusion for them.

Email from Diane Ware (Aug. 1, 2012) (J.A. 1168) (emphases added).

Oberthur attempts to justify the freeze on the ground that the "discretionary" nature of its wage benefit programs made a freeze necessary. *See* Oberthur Br. 33-34. But while Oberthur may have exercised discretion over the initial granting of the benefits, substantial evidence supports the NLRB's finding that Oberthur had already approved bonuses and scheduled wage increases for several employees prior to the freeze. *See* 362 N.L.R.B. No. 198, at 11-12 & nn.9-10 (ALJ Op.); *id.* at 3 & n.14 (2015 Board Order). Moreover, the NLRB's remedy applied only to an employee "whose approved bonus or scheduled wage increase was delayed because of the Respondent's policy to freeze such benefits during the pendency of the election." *Id.* at 14 (ALJ Op.); *see id.* at 1 n.5 (2015 Board Order) ("A traditional backpay remedy, with interest, is appropriate for those employees who would have received spot bonuses but for the Respondent's unlawful conduct.").

The NLRB has recognized an exception to the principle that employers must maintain the status quo regarding wage benefits

during organizing campaigns. Under this exception, an employer may postpone an expected wage or benefits increase so long as it makes clear to employees that: (1) "the sole purpose" of the postponement "is to avoid the appearance of influencing the election's outcome"; and (2) "the employees w[ill] receive their . . . increases after the election regardless of the outcome." *Wal-Mart Stores, Inc.*, 349 N.L.R.B. 1007, 1012-13 (2007) (internal quotation marks omitted); *see Grass Valley Grocery Outlet*, 332 N.L.R.B. 1449, 1451 (2000); *Uarco, Inc.*, 169 N.L.R.B. 1153, 1154 (1968). In this case, substantial evidence supports the Board's conclusion that Oberthur failed to satisfy those requirements. The record shows that Oberthur did not communicate to its employees that the sole purpose of the freeze was to avoid the appearance of influence and that the benefits would be reinstated no matter the outcome of the election. To the contrary, Ware's email indicates that the company hoped to leave employees with the impression that the freeze was "linked to unions" and that their promotions would be processed "once we vote the union down." Ware Email, J.A. 1168.

Oberthur's challenge to the Board's remedy is also without merit. Our review is especially deferential in this context, in light of the Board's "broad discretionary power . . . to fashion remedies that effectuate the policies of the Act" under NLRA § 10(c), 29 U.S.C. § 160(c). *Petrochem Insulation, Inc. v. NLRB*, 240 F.3d 26, 34 (D.C. Cir. 2001). The Board held that "[a] traditional backpay remedy, with interest, is appropriate for those employees who would have received spot bonuses but for the Respondent's unlawful conduct." *Oberthur*, 362 N.L.R.B. No. 198, at 1 n.5 (2015 Board Order). Although Oberthur complains that the Board's 2015 order "offers no methodology whatsoever," Oberthur Br. 36, the order made clear that "the identification of employees unlawfully denied spot bonuses and the determination of the amount they should receive, including

interest" will be determined at the compliance stage, 362 N.L.R.B. No. 198, at 1 n.5. And this Court has consistently declined to consider challenges to remedial orders when the Board has "reserve[d] the issue for later consideration." *Scepter, Inc. v. NLRB*, 448 F.3d 388, 391 (D.C. Cir. 2006); *see E.I. Du Pont de Nemours & Co. v. NLRB*, 489 F.3d 1310, 1317 (D.C. Cir. 2007). There is no reason to depart from that practice here.

III

This brings us to Oberthur's objections to the Board's disposition of the representation case. The parties' stipulated election agreement defined the bargaining unit as covering "[a]ll full-time employees" working in fifteen specified departments at the Exton plant. Stipulated Election Agreement (Aug. 8, 2012) (J.A. 91). When a representation election involves such a stipulated agreement, "the Board's function is to ascertain and enforce the parties' intent, provided that it is not contrary to any statutory provision or established Board policy." *Halsted Commc'ns*, 347 N.L.R.B. 225, 225 (2006) (citing *Caesar's Tahoe*, 337 N.L.R.B. 1096, 1097 (2002)).

As relevant here, NLRA § 9(b)(1) bars the Board from certifying any bargaining unit that includes both "professional" employees -- as defined by NLRA § 2(12), 29 U.S.C. § 152(12) -- and non-professional employees unless "a majority of such professional employees vote for inclusion in such unit." 29 U.S.C. § 159(b). To comport with this requirement when a mixed unit is contemplated, the Board's policy has long been to utilize special ballots that ask professional employees both whether they wish to be included in a unit with non-professionals and whether they wish to be represented by the union. This is known as a "*Sonotone* election." *San Miguel*

*Hosp. Corp. v. NLRB*, 697 F.3d 1181, 1183 & n.2 (D.C. Cir. 2012); *see Sonotone Corp.*, 90 N.L.R.B. 1236, 1240-42 (1950).

In this case, the Agreement did not specify the job titles of covered employees. Instead, it simply stated that employees working in fifteen of Oberthur's departments were "[i]ncluded" in the unit and that "[a]ll other employees, temporary and seasonal employees, confidential employees, guards and supervisors as defined in the Act" were "[e]xcluded." Stipulated Election Agreement (Aug. 8, 2012) (J.A. 91). As the ALJ noted, although the Agreement neither expressly included nor expressly excluded "professional employees," 362 N.L.R.B. No. 198, at 9, it specifically set forth "non-*Sonotone*" language to be used on all ballots:

> "The question on the ballot will be 'Do you wish to be represented for purposes of collective bargaining by GRAPHIC COMMUNICATIONS CONFERENCE INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 14-M?' The choices on the ballot will be 'Yes' or 'No.'"

Stipulated Election Agreement (Aug. 8, 2012) (J.A. 92).

Because "the stipulation on its face [was] neither contrary to Board policy nor violative of Section 9(b)(1) of the Act," the Board's role was to enforce the intent of the parties. *Hollywood Med. Ctr.*, 275 N.L.R.B. 307, 308 (1985); *see Sunrise, a Cmty. for the Retarded, Inc.*, 282 N.L.R.B. 252, 252 (1986); *Valley View Hospital*, 252 N.L.R.B. 1146, 1147 (1980). In light of the stipulated ballot language and the parties' implied agreement (given the background rule of § 9(b)) that the bargaining unit would include only non-professional employees, the Regional Director administered a conventional, non-*Sonotone* election on September 7, 2012.

14

The company raised no timely objections whatsoever to that decision or to any other aspect of the election. The union, by contrast, did raise timely objections to the ballots cast by John DiTore and Birendra Sahijwana -- both engineers in the company's Quality Control department -- on the ground that they were ineligible to vote in the representation election. The Board agreed that both DiTore and Sahijwana could not vote in the election because they qualified as "professional employees" under 29 U.S.C. § 152(12), and that therefore their ballots should not be counted. 362 N.L.R.B. No. 198, at 2 (2015 Board Order); *id.* at 9-10 (ALJ Op.). It explained that, although both employees worked in the company's Quality Control department, which was listed as an "[i]ncluded" department under the Agreement, Stipulated Election Agreement (Aug. 8, 2012) (J.A. 91), their status as professional employees precluded their inclusion in the unit because the parties had provided for a conventional, non-*Sonotone* election to form a unit of only non-professional employees.

In its petition for review, Oberthur raises two objections to the representation election: (i) that the Board erred in concluding that DiTore and Sahijwana were "professional employees" under NLRA §§ 2(12) and 9(b); and (ii) that even if they were professional employees, the representation election was invalid because DiTore and Sahijwana were denied their rights to a *Sonotone* election under Section 9(b)(1).

A

We begin with Oberthur's timely objection to the Board's finding that DiTore and Sahijwana were "professional employees" within the meaning of Sections 2(12) and 9(b). 362 N.L.R.B. No. 198, at 2 (2015 Board Order). The Board adopted the ALJ's findings, which the ALJ reached by applying the four factors set forth in Section 2(12)(a) to the specific work that

DiTore and Sahijwana performed for the company. 362 N.L.R.B. No. 198, at 9-10 (ALJ Op.). The Board is entitled to deference in the application of such factors. *See generally Evergreen Am. Corp. v. NLRB*, 362 F.3d 827, 837-838 (D.C. Cir. 2004); *Seattle Opera v. NLRB*, 292 F.3d 757, 761 (D.C. Cir. 2002).

In relevant part, Section 2(12)(a) defines "professional employee" as:

> any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning . . . as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes.

29 U.S.C. § 152(12)(a). In applying these factors to the engineers' work, the ALJ began by explaining that DiTore was a "Lean Engineer," which is "a subspecialty in engineering" that draws on "science, engineering, and applied mathematics" to advance the goal of "mak[ing] the manufacturing process itself more efficient." 362 N.L.R.B. No. 198, at 9 (ALJ Op.). Sahijwana, the ALJ noted, was a "quality engineer," who was responsible for ensuring "that the [company's] products once

manufactured" were "without defects" and "m[e]t appropriate standards." *Id.*

The company contends that the Board and ALJ erred by "applying a one-size-fits-all approach" to its determination that DiTore and Sahijwana were professionals. Oberthur Br. 18. We disagree. The ALJ specifically addressed distinct features of the work each engineer performed and made the following findings. First, neither engineer performed "routine or standardized" work, since they had to make "independent use of the skills and advanced knowledge" they "acquired through their engineering education and work histories." 362 N.L.R.B. No. 198, at 9-10; *see* 29 U.S.C. § 152(12)(a)(i), (iii), (iv). They also had to exercise "discretion" and "judgment" in their daily work, 29 U.S.C. § 152(12)(a)(ii), and their performance could not be evaluated in a "standardized" fashion, *id.* at (iii). Their supervisor, the ALJ noted, also held an engineering degree and his "background in engineering enable[d] him to understand what DiTore and Sahijwana [were] doing." 362 N.L.R.B. No. 198, at 9. Although other employees in the Quality Control department were "paid on an hourly basis," *id.*, DiTore and Sahijwana were salaried employees. Finally, unlike the other employees in the Quality Control department who "ha[d] high school degrees" only, *id.*, the work DiTore and Sahijwana performed required "advanced" knowledge, 29 U.S.C. § 152(12)(a)(iv). DiTore held a bachelor's degree in mechanical engineering and masters degrees in business administration and operations management, 362 N.L.R.B. No. 198, at 9; "John DiTore LinkedIn," (J.A. 941), while Sahijwana earned a bachelor's degree in engineering and masters degrees in business and engineering, 362 N.L.R.B. No. 198, at 9.

Oberthur maintains that the Board placed unwarranted reliance on the case of *Westinghouse Electric Corp.*, 163 N.L.R.B. No. 96 (1967), which Oberthur thinks is

distinguishable from its own situation. But substantial record evidence shows that, like the steam engineers who the Board found were professionals in *Westinghouse*, DiTore and Sahijwana performed work that (i) drew upon "specialized technical or professional knowledge," and (ii) required them to lead "cooperative efforts"; and that both were (iii) "salaried," and (iv) "ha[d] academic degrees." *Westinghouse*, 163 N.L.R.B. No. 96, at 2-3 (1967). Accordingly, because the Board's finding that DiTore and Sahijwana qualified as professional employees is supported by substantial evidence, and is "rational and in accord with past precedent," we uphold it. *NBCUniversal Media v. NLRB*, 815 F.3d 821, 829 (D.C. Cir. 2016) (internal quotation marks omitted).[4]

B

Oberthur maintains that, even if the Board did not err in finding that DiTore and Sahijwana were "professional employees," the election certification was nonetheless invalid because the two engineers were never issued *Sonotone* ballots. Ordinarily, we would review the Board's certification decision for abuse of discretion. *See 800 River Rd. Operating Co., LLC v. NLRB*, 846 F.3d 378, 386 (D.C. Cir. 2017). In this case, however, "[w]hatever the merits of [Oberthur's] contention, [it] did not timely raise it before the Board." *Sundor Brands, Inc. v. NLRB*, 168 F.3d 515, 520 (D.C. Cir. 1999). Under the Board's rules, any objection to "the conduct of the election or to conduct affecting the results of the election" must be made within seven

---

[4] We also reject the company's post-election challenge to the ballot cast by another employee, Khalid Husain. That claim is barred because Husain's ballot was cast and commingled with the other ballots before Oberthur raised any objection. *See NLRB v. A.J. Tower Co.*, 329 U.S. 324, 331-33 (1946); *Schoolman Transp. Sys., Inc. v. NLRB*, 112 F.3d 519, 521 (D.C. Cir. 1997).

days after the Board's tally of the ballots. 29 C.F.R. § 102.69(a). As we have said, "[t]he Board's seven-day deadline reflects its long-standing policy favoring finality in election results in order to further industrial peace." *Manhattan Ctr. Studios, Inc. v. NLRB*, 452 F.3d 813, 816 (D.C. Cir. 2006) (citing *A.J. Tower Co.*, 329 U.S. at 331-32).

The first time Oberthur raised its *Sonotone* argument was in its exceptions to the decision of the ALJ, more than six months after the deadline for making objections had passed. That is far too late. *See Tekweld Solutions, Inc.*, 361 N.L.R.B. No. 18, at 1 (2014). "Because the Company neither raised its objection in a timely fashion nor alleged special circumstances that could excuse its tardiness, the Board properly declined to consider it." *Sundor*, 168 F.3d at 520.

IV

Finally, we address the Board's finding that the company violated Sections 8(a)(1) and (5) by refusing to bargain with the union and denying its information requests following certification. *Oberthur*, 364 N.L.R.B. No. 59, at 2-3 (2016 Board Order). Oberthur does not deny that it did these things. Accordingly, because we have held that "the certification was valid, it follows apodictically that the [company's] refusal to bargain [and provide the requested information] violated Sections 8(a)(1) and (5) of the Act." *San Miguel Hosp. Corp.*, 697 F.3d at 1184. We therefore grant the Board's cross-application to enforce its 2016 order directing the company to bargain in good faith and furnish the requested information.

19

V

For the foregoing reasons, we deny Oberthur's petition for review and grant the Board's applications for enforcement.

*So ordered.*