# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 29, 2021        Decided July 23, 2021

No. 20-1112

COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

T-MOBILE USA, INC.,
INTERVENOR

———

Consolidated with 20-1186

———

On Petitions for Review of Orders
of the National Labor Relations Board

———

*Matthew J. Ginsburg* argued the cause for petitioner. With him on the briefs were *Glenda L. Pittman* and *James B. Coppess*.

*Eric Weitz*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Peter B. Robb*, General Counsel, *Ruth E. Burdick*, Acting Deputy Associate General Counsel, *David Habenstreit*,

Assistant General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

*Mark Theodore* argued the cause for intervenor T-Mobile USA, Inc. in support of respondent.

Before: ROGERS, PILLARD and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The Communication Workers of America petitions for review of a decision by the National Labor Relations Board (NLRB) that T-Mobile did not unlawfully discriminate against union activity at its call center in Wichita, Kansas.  The Union's claims arise from T-Mobile's responses to an email sent by a customer service representative through her work email account inviting her coworkers to join ongoing efforts at the call center to organize a union.  T-Mobile reprimanded the customer service representative for sending the email, and call center management further responded by sending out a facility-wide email stating that it did not permit its employees to send mass emails through the company email system for non-business purposes.

An administrative law judge held that, in so responding, T-Mobile violated the National Labor Relations Act (NLRA), including by discriminating against the employee based on the union-related content of her email.  The judge rejected T-Mobile's claim that its reactions to the email were justified by written company policies.  The Board reversed in all respects relevant to these petitions, distinguishing evidence that T-Mobile had previously permitted mass emails on the ground that those emails were not similar in character to the email here.  As the Board saw it, T-Mobile's emails were business-related, whereas the one that drew the reprimand was for employees'

personal benefit or to advance an organization other than the employer.

We grant the Union's petitions in full. The Board erred under our precedent by relying on its own post hoc distinction between permissible and impermissible employee conduct to reject the evidence of disparate treatment. Based on that evidence of disparate treatment, and because the policies and rationales that T-Mobile itself offered in defense of its actions do not support them, the Board's decision to reverse the ALJ's finding that T-Mobile discriminatorily enforced company policies related to email use is not supported by substantial evidence.

## BACKGROUND

T-Mobile operates a call center in Wichita, Kansas, where it employs approximately 600 customer service representatives. Those representatives take calls at individual workstations from T-Mobile customers calling in for customer service. The representatives are organized into teams of about fifteen who sit in the same area of the office and report to a team "coach." A coach is in turn overseen by a team manager.

Since 2009, the Communications Workers of America (the Union) has been trying to organize employees at the Wichita call center to form a union.[1] Call center management monitors union organizing efforts at the call center. For instance, when call center management learns of picketing or leafleting by union organizers in the call center's parking lot, it generates what the company calls a "Third Party Activity Report" of basic details about the incident. The report is then forwarded to T-Mobile's corporate headquarters. A human resources

---

[1] In 2011 and 2015, T-Mobile settled allegations that the company engaged in unfair labor practices at the call center.

manager testified that the reports are meant to cover any activity by a third party that would "disrupt" the center's operations, J.A. 118-19, though she acknowledged that, in practice, all reports generated at the center concern union activity, J.A. 127.

On May 29, 2015, Chelsea Befort, a customer service representative at the call center, emailed her call center coworkers on her work computer from her work email address encouraging them to join union organizing efforts. Befort first tried to send the email at the start of her lunch break to 595 of the center's customer service representatives at once, copying their addresses from an email distribution list of all employees in that category. When she returned from lunch, she saw that she had received an automated response notifying her that she could email no more than 100 people at a time. She thus tried emailing smaller groups of her coworkers, succeeding in sending her message once the number of recipients fell below 100. She reached out to all of the customer service representatives in several separate email batches sent over the course of that day, all while she was on break or finished with her shift. In the emails, Befort wrote: "Feel free to contact me with any questions, but please do so **outside of working hours**." J.A. 172 (emphasis in original). She also invited the recipients to join people involved in the organizing efforts at a social gathering outside of work the next evening. Because the emails had identical contents, we refer to them simply as Befort's email.

Befort's email prompted three responses by call center management. First, on June 1, a T-Mobile human resources manager generated a Third Party Activity Report stating that several customer service representatives notified management of Befort's email. Second, on June 2, Jeff Elliott, director of the call center, sent an email to all of the call center's

employees regarding Befort's email. Third, also on June 2, Lillian Maron, Befort's team manager, met with Befort and her coach about the email. The latter two responses—Elliott's email and Maron's meeting—are the bases of the unfair labor practice claims in this case.

In his facility-wide email, Jeff Elliott said Befort's coworkers had reported Befort's email to management and that many found it disruptive. Elliott apologized for any disruption and used his email "to remind [the recipients] that it is not appropriate for employees to send emails to large numbers of employees." J.A. 181. Specifically, he noted that T-Mobile does not "allow mass communication for any non-business purpose since this disrupts the work place and distracts employees from their work." *Id*. In addition, responding to an assertion in Befort's email that workers at the call center were being silenced, Elliott stated that "[e]mployees have countless opportunities to communicate with others when they are not working." *Id*. He identified, among other communication opportunities, use of "social networks—off the job of course." *Id*. And he went on to say that "it is not appropriate to solicit or discuss other issues when you are supposed to be working." *Id*.

On the same day, Befort's team coach called her into a meeting with team manager Maron. According to Befort, Maron told Befort that customer service representatives "cannot send out mass emails and that anything union-related cannot be sent while on the clock." J.A. 52. When Befort pointed out that she was not on the clock when she sent the emails, Maron noted that the problem was that recipients of the email were on the clock when they opened and read the email. She did not, however, explain how Befort was responsible for when her co-workers might have chosen to read her email. According to Befort, Maron also said that "anything union-

related could not be done . . . by using the company's email system and that it could not be discussed within our working areas." *Id.* Maron's recollection of her conversation with Befort differed, though she acknowledged she told Befort she may not discuss the union when either Befort or the coworker she addresses is talking to customers. Maron testified that she adhered to talking points that a human resources manager prepared specifically for the meeting with Befort. Included among those talking points was a draft statement to Befort that she may use email to communicate about the union so long as neither she nor the recipient is working and the email use is not disruptive.

In response to T-Mobile's actions regarding Befort's email and other conduct at the call center in 2015 not at issue on appeal, the Union filed unfair labor practice charges. At a hearing before an administrative law judge (ALJ), call center director Elliott and a human resources manager testified that Befort's email violated three company policies. One of the policies they identified, T-Mobile's Acceptable Use Policy, establishes rules regarding the company's information and communication resources, including that such resources "are to be used for legitimate business purposes." J.A. 191. The policy permits "[i]ncidental and infrequent personal use of the resources" so long as such use is consistent with other terms of the policy. J.A. 192. Among the prohibited uses, the Acceptable Use Policy identifies distribution of "junk mail and chain letters," and advocacy or solicitation on behalf of outside organizations. J.A. 192. Call center management asserted that Befort's email was both junk mail and barred solicitation.

The second policy T-Mobile management invoked at the hearing was a No Solicitation or Distribution Policy in the Employee Handbook. That policy prohibits "[s]olicitation of any kind by employees on Company premises during working

time (of either the employee engaged in soliciting or the employee being solicited)." J.A. 202. Call center management asserted that Befort's email was received and read by employees during working time.

The third policy T-Mobile identified to the ALJ was its Enterprise User Standard, which sets out measures to ensure the security of T-Mobile's information assets. The standard states that "[u]sers must follow the appropriate authorization process for requesting an account granting specified access and permission levels" and that "[a]ll access that is not explicitly authorized is forbidden." J.A. 206. Management argued Befort violated the standard because she lacked the authority to send an email to the distribution list covering all customer service representatives yet found a way around what it cast as a mass-communication bar.

In support of its allegation that T-Mobile disparately enforced its policies, the NLRB's General Counsel identified evidence of call center-wide emails unrelated to union activity that T-Mobile had previously allowed. For instance, an employee emailed the entire call center about the employee's missing phone charger. And employees used the reply-all function in response to facility-wide emails regarding personal milestone events, including emailed birth announcements, information about baby showers, and death notices. Other emails the General Counsel identified as comparator non-business emails were from management, alerting employees to, for instance, popcorn, nachos, or slushies available in the office, employee events like salsa-making or lip sync contests, or free sports tickets. In contrast to call center management's response to Befort's email, T-Mobile disregarded and never enforced its policies against any such non-union-related mass emails.

After a hearing, the ALJ held that T-Mobile had violated Section 8(a)(1) of the National Labor Relations Act, which states that it is an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" their organizing rights. 29 U.S.C. § 158. The first unfair labor practice was T-Mobile's disparate application of its Acceptable Use Policy, No Solicitation or Distribution Policy, and Enterprise User Standard to Befort's union activity. In reaching this conclusion, the ALJ found that Befort's email was neither junk mail nor solicitation and thus did not fall within the scope of either of the first two policies. As to the third policy, the ALJ noted that T-Mobile failed to produce any evidence that it had enforced the Enterprise User Standard against any other employee's use of an email distribution list.

In addition to the disparate enforcement determination, the ALJ held that T-Mobile committed other unfair labor practices in responding to Befort's email. Two of the violations relevant here stem from restrictions on communication Elliott included in his June 2 email. He stated that T-Mobile prohibited its employees from: (1) sending mass email to other employees, (2) using social media while at work, and (3) discussing the union during work time. Elliott claimed that the statements in his email merely reflected existing T-Mobile policies, but employees testified T-Mobile had never previously communicated those particular restrictions. As relevant here, the ALJ determined that, through Elliott's email, T-Mobile unlawfully promulgated and maintained rules in response to Section 7 activity and that the rules constituted overly broad restrictions on employees' Section 7 rights. In addition, the ALJ found that Maron's statement to Befort that Befort "could not use [T-Mobile's] email to send messages about the Union" was "coercive because an employee would believe she did not have a right to use the email system to communicate about Union or other protected activities." *T-Mobile USA, Inc. (T-*

*Mobile I*), 369 N.L.R.B. No. 50, slip op. at 18 (Apr. 2, 2020) (J.A. 29).

On administrative appeal, the Board affirmed the ALJ's determination that T-Mobile violated Section 8(a)(1) by telling employees that they could not talk about the Union during worktime; the Board otherwise reversed the ALJ in relevant part. In assessing the Union's allegation that T-Mobile discriminatorily applied its Acceptable Use Policy, No Solicitation or Distribution Policy, and Enterprise User Standard, the Board applied its own precedent that, "in order to be unlawful, discrimination must be along Section 7 lines." *Register Guard*, 351 N.L.R.B. 1110, 1118 (2007), *enforced in part and remanded sub nom. Guard Publ'g Co. v. NLRB*, 571 F.3d 53 (D.C. Cir. 2009). "In other words, unlawful discrimination consists of disparate treatment of activities or communications of a similar character because of their union or other Section 7-protected status." *Id.*

Applying that standard to the facts at hand, the Board acknowledged "numerous" facility-wide emails in the record from management on "nonwork-related subjects"—including the email from a non-supervisory senior representative about the lost phone charger, and two emails from Elliott's administrative assistant about signing a birthday card for T-Mobile's CEO. *T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 3 (J.A. 14). But, noting that T-Mobile "never permitted emails in favor of a specific union or against union activity," the Board held that "the type of emails that [T-Mobile] sent, or permitted employees to send, were not in any way connected to Section 7 activity and were not similar in character to Befort's emails." *Id.* In explaining why Befort's email was not similar, the Board offered the following distinction:

> In particular, the comparator emails cited by the General Counsel as disparate-treatment were, by and large, emails that [T-Mobile] sent for its own business-related interests of improving the camaraderie among its work force or helping to reunite a lost item with its owner. There is no evidence that [T-Mobile] permitted employees to send mass emails for their personal benefit, much less to further any [non-T-Mobile] organizational purpose.

*Id.* Given the absence of such evidence, the Board held that the NLRB General Counsel had failed to satisfy his burden of proving discriminatory enforcement of T-Mobile's policies.

In a supplemental decision, the Board also reversed the ALJ's findings that the new rules stated in Elliott's emails were promulgated in response to Section 7 activity and were overbroad. Under recent Board precedent that holds an employer is presumptively entitled to restrict its employees' personal use of its information technology, the Board held "that Befort did not have a Section 7 right to use her work email to send her message to her coworkers." *T-Mobile USA, Inc.* (*T-Mobile II*), 369 N.L.R.B. No. 90, slip op. at 1 (May 27, 2020) (J.A. 37) (citing *Caesars Ent.*, 368 N.L.R.B. No. 143, slip op. at 12 (Dec. 16, 2019)). Based on that determination, it concluded that the rules in Elliott's email "were promulgated in response to Befort's impermissible use of its email system in light of [T-Mobile's] lawful restriction, and not because she had engaged in any protected activity." *Id.* It also held the announced rules would not be reasonably interpreted by other employees to interfere with Section 7 activity, so they were not overbroad. Because T-Mobile "sent its email in response to Befort's violation of several of its policies," the Board explained, other employees at the call center "would

understand that [the new rules] do not prohibit or interfere with the exercise of NLRA rights, but only restrict the type of impermissible use of [T-Mobile's ] email system engaged in by Befort." *Id.* at 1-2 n.1.

The Union petitioned this court for review of the initial decision and supplemental decision, we consolidated those petitions, and T-Mobile intervened in support of the Board.

## DISCUSSION

The Union's main challenge to the Board's decision is that T-Mobile's responses to Befort's email discriminated against expressive activity protected by Section 7 of the NLRA. The Union claims that T-Mobile's conduct related to Befort's email was further unlawful in several respects. "This court will uphold a decision of the Board unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard or departed from its precedent without providing a reasoned justification for doing so." *Commc'n Workers of Am. v. NLRB*, 994 F.3d 653, 658 (D.C. Cir. 2021) (citation and internal quotation marks omitted).

## A. Discriminatory Enforcement

Under the Board's recent decision in *Caesars Entertainment*, which the Union does not challenge, "facially neutral restrictions on the use of employer IT resources are generally lawful to maintain, provided that they are not applied discriminatorily." 368 N.L.R.B. No. 143, slip op. at 12. The Union claims discriminatory application—that is, that T-Mobile "selectively enforced its e-mail policy against the union." *Guard Publ'g*, 571 F.3d at 58. "Though facially neutral restrictions on worktime solicitations in work areas are presumptively valid, an employer commits an unfair labor practice when it applies the rule in non-neutral fashion to union

activities." *ITT Indus., Inc. v. NLRB*, 251 F.3d 995, 1006 (D.C. Cir. 2001).

The Union argues that T-Mobile singled out Befort's email for condemnation because of its union-related content, and it identifies other mass emails permitted by T-Mobile as evidence of disparate treatment. The ALJ rejected T-Mobile's reliance on several facially neutral company policies that it claimed covered Befort's email and not the comparator missives without singling out union content. The Board reversed, concluding that T-Mobile did not discriminate "along Section 7 lines." *T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 3 (J.A. 14) (quoting *Register Guard*, 351 N.L.R.B. at 1118). In so doing, the Board cited the definition of discrimination it established in *Register Guard*, namely "disparate treatment of activities or communications of a similar character because of their union or other Section 7-protected status." 351 N.L.R.B. at 1118. In *Register Guard*, the Board noted that, for example, "an employer clearly would violate the Act if it permitted employees to use e-mail to solicit for one union but not another, or if it permitted solicitation by antiunion employees but not by prounion employees." *Id.* In such cases, an employer "has drawn a line between permitted and prohibited activities on Section 7 grounds." *Id.* The Board emphasized that by contrast, "nothing in the [NLRA] prohibits an employer from drawing lines on a non-Section 7 basis," such as a line "between invitations for an organization and invitations of a personal nature," or "between business-related use and non-business-related use." *Id.*

In this case, after acknowledging the various emails that T-Mobile allowed, the Board noted that the company had "never permitted emails in favor of a specific union or against union activity." *T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 3 (J.A. 14). But those are not the only scenarios that run afoul of

the bar against discriminating against union-related activity. The Board apparently recognized as much, supplementing that patently inadequate distinction with its own explanation of why Befort's email was not "similar in character" to the other emails. *Id.* It characterized the other emails as "by and large, emails that [T-Mobile] sent for its own business-related interests." *Id.* "There is no evidence," the Board noted, that T-Mobile "permitted employees to send mass emails for their personal benefit, much less to further any [non-T-Mobile] organizational purpose." *Id.*

The parties here agree that the Board's *Register Guard* standard governs the Union's discrimination claim. *See Caesars Ent.*, 368 N.L.R.B. No. 143, slip op. at 8 n.68 (adhering to *Register Guard*'s discrimination standard). That standard must be understood in light of our decision in *Guard Publishing*, reviewing the Board's application of the standard in *Register Guard* itself. The Board's analysis here—reliant on a post hoc line between permissible and impermissible conduct the employer had not itself established before the conduct at issue occurred—repeats the very error we identified in *Guard Publishing*.

In *Guard Publishing*, a newspaper disciplined its employee for sending union-related emails in violation of a policy prohibiting use of the company's email system for non-work-related solicitations. 571 F.3d at 54. Finding that one of the emails was not a solicitation and thus not prohibited by the policy, the Board concluded that discipline for that email was unlawfully discriminatory. *Id.* at 57. But it reached the opposite conclusion with regard to two emails that were solicitations. *Id.* at 57-58. Enforcement of the policy against those emails was not discriminatory, the Board held, even though the company permitted "solicitations for 'sports tickets or other similar personal items.'" *Id.* at 58 (quoting *Register*

*Guard*, 351 N.L.R.B. at 1119). The Board allowed discipline in response to union-related but not other solicitations by reference to a line not drawn by the employer's own policy or rationale, reasoning that "there was 'no evidence that the [newspaper] permitted employees to use e-mail to solicit other employees *to support any group or organization*.'" *Id.* at 58 (quoting *Register Guard*, 351 N.L.R.B. at 1119) (emphasis added in *Guard Publ'g*).

We sustained the Board's holding that discipline for the non-solicitation email was discriminatory: "Enforcement of the [policy] against [the email] could not constitute a neutral application of that policy because, simply put, the [policy] did not cover such an e-mail." *Id.* at 58-59. But we held substantial evidence did not support the Board's decision that the newspaper lawfully disciplined the employee for the union-related solicitations, because the Board relied on "a post hoc invention" to distinguish them from solicitations that the newspaper allowed. *Id.* at 60. "Whatever the propriety of drawing a line barring access based on organizational status" of an email's subject matter, we noted, "neither the company's written policy nor its express enforcement rationales relied on an organizational justification." *Id.* The newspaper's policy "made no distinction between solicitations for groups and for individuals, mentioning solicitations for 'outside organizations' as just one example of the forbidden category of all 'non-job-related solicitations.'" *Id.* (citation omitted). And the newspaper's "disciplinary warning, which explained the rationale for disciplining the [employee], did not invoke the organization-versus-individual[-solicitations] line drawn by the Board." *Id.* "To the contrary, it told [the employee] to 'refrain from using the Company's systems for union/*personal* business'—the reference to 'personal' making it clear that the offense did not depend on whether an organization was

involved." *Id.* (citation omitted) (emphasis added in *Guard Publ'g*).

The Board here ignores the lesson of *Guard Publishing*. It argues that "the question is whether [T-Mobile's] decision to restrict Befort's use of its proprietary email system was discriminatory relative to its treatment of similar emails[.]" Resp't Br. 21. *Guard Publishing* makes clear, however, that the consistency of an employer's responses to union-related and nonunion employee conduct is measured not by whether the employer or Board can identify a legitimate, union-neutral distinction after the fact that the employer might lawfully have drawn, but by reference to the policies the employer actually had in place and the reasons on which it in fact relied for the action challenged as discriminatory. Because *Guard Publishing* itself, like this case, involved use of company email, speculation as to whether the Board might apply a different standard in cases not involving "the use of employer equipment," Resp't Br. 18, is of no moment here.

Turning to the policies and rationales in this case, we conclude that the Board's decision that T-Mobile's responses to Befort did not discriminate against Section 7 activity is not supported by substantial evidence.

**1.** In defense of its reactions, T-Mobile has invoked three company policies that were in place when Befort sent her email. The first is T-Mobile's Acceptable Use Policy, specifically the ban on junk mail. The second is its No Solicitation or Distribution Policy. And the third is its Enterprise User Standard. But, apart from general suggestions of a policy against solicitation, T-Mobile's contemporaneous responses to Befort's email did not clearly cite any of those three policies. Nor did the Board rely on any of the three policies in reversing the ALJ. T-Mobile relied chiefly on a

claimed prohibition on mass emails, discussed in the next section, and raised the Acceptable Use Policy for the first time only after the Union brought its unfair labor practice charges. Nonetheless, T-Mobile continues to argue that Befort's email was barred by existing policies. Its claims on that front come up short.

According to factual findings by the ALJ, left undisturbed by the Board, neither the Acceptable Use Policy nor the No Solicitation or Distribution Policy applied to Befort's email, meaning that T-Mobile's decision to discipline her "could not constitute a neutral application" of those policies. *Guard Publ'g*, 571 F.3d at 59. (More on the third policy in a moment.) T-Mobile argued that Befort's email was prohibited "junk mail" under the Acceptable Use Policy, but the ALJ concluded that the email did not meet "commonly accepted definitions" of that term. *T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 15 (J.A. 26). As a result, she noted, "application of the policy was not warranted." *Id.* And, contrary to T-Mobile's claim under its No Solicitation or Distribution Policy, the ALJ also found that the email did not meet "the accepted definition of solicitation." *Id.* at 16 (J.A. 27). Rather, in the email, "Befort asked [her coworkers] to attend a social function to find out more about joining the union." *Id.* "Because [T-Mobile] misclassifies the email as solicitation," the ALJ held, it "disparately enforces the rule against the email." *Id.* T-Mobile's failure to challenge factual findings by the ALJ incompatible with its position defeats its continued reliance on those two policies.[2]

---

[2] The Board claims that reliance on the ALJ's factual findings is generally misplaced in this case because the ALJ issued her decision under a legal framework governing an employee's right to use an employer's email system that was subsequently overruled by the Board. *See Caesars Ent.*, 368 N.L.R.B. No. 143, slip op. at 1

T-Mobile focuses its attention on appeal on its third cited policy, the Enterprise User Standard, which the company claims effectively imposes a restriction on mass emails.[3] T-Mobile notes that Befort lacked access to a facility-wide email distribution list that would have allowed her to email all of her coworkers in one go. Under the Enterprise User Standard, "[u]sers must follow the appropriate authorization process for requesting an account granting specified access and permission levels." J.A. 206. The Standard states that "[a]ll access that is not explicitly authorized is forbidden." *Id.* T-Mobile contends that Befort "circumvented her lack of access to the distribution list," Intervenor Br. 12, by sending separate emails as a way to contact all of her coworkers with the same message, which it appears to argue violated the Enterprise User Standard's limitation on access. *See id.* at 8 ("[T]he fact that Befort successfully defeated the restrictions does not equate to authorization.").

T-Mobile's reliance on the Enterprise User Standard fails for at least two reasons. First, the Board did not itself hold that the Enterprise User Standard covered Befort's email, instead rejecting evidence of disparate treatment based on its own line between permissible and impermissible mass emails, discussed below. It was by reference to such a line, not the Enterprise User Standard, that the Board concluded that the record lacked substantial evidence that T-Mobile "discriminat[ed] . . . along

---

(overruling *Purple Commc'ns, Inc.*, 361 N.L.R.B. 1050, 1050 (2014)). But the Board did not respond to the specific factual findings that undermine its analysis nor explain how the legal change it references could have affected the underlying factual realities.

[3] Unlike with the findings regarding the Acceptable Use Policy and the No Solicitation or Distribution Policy, the ALJ rejected T-Mobile's reliance on the Enterprise User Standard by applying a standard from *Purple Communications*, which, as discussed *supra* note 2, the Board later overruled in *Caesars Entertainment*.

18

Section 7 lines." *T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 3 (J.A. 14).

Second, even assuming the Board did implicitly accept T-Mobile's claim that the Enterprise User Standard applied to Befort's email, substantial evidence does not support that finding. T-Mobile does not explain how, simply because sending several emails to many employee addresses at once can achieve a similar result as would sending a single e-mail to an employer-created distribution list, the former constitutes unauthorized access. T-Mobile failed to produce any evidence that it had ever previously enforced the Enterprise User Standard against unauthorized use of distribution lists (let alone against separately compiled approximations), or that the Standard actually barred sending separate emails to groups of coworkers who match those jointly accessible via a limited-access distribution list. T-Mobile acknowledged that no policy prevents a customer service representative in Befort's position from sending group emails including as many as a hundred people. And the automated response Befort received when she tried to send her emails to more than one hundred coworkers stated she should "try to resend with fewer recipients," J.A. 228, which is exactly what she did.

There is no suggestion that Befort somehow violated the authorization process for access to her email or exceeded "specified access and permission levels" by breaking into a distribution list or any other component of the email system. *Cf. Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) ("In the computing context, 'access' references the act of entering a computer 'system itself' or a particular 'part of a computer system,' such as files, folders, or databases."). Under that set of facts, we decline to fill in the Board's silence on how Befort's email implicated the Enterprise User Standard. We see no record basis upon which to credit T-Mobile's theory that

Befort's use of multiple emails somehow constituted unauthorized access.

**2.** T-Mobile's contemporaneous rationales for reprimanding Befort for her email also fail to support its actions. The primary reason the company gave at the time was that the email was a "mass" email. Specifically, in a facility-wide message disapproving of Befort's email, Elliott, the center's director, asserted that "[w]e don't allow mass communication for any non-business purpose." J.A. 181. The talking points that Maron brought to her meeting with Befort included a similar statement.

The ALJ found that this claimed prohibition on mass emails was a new workplace rule and that it was promulgated unlawfully in response to union activity. But even if the statement reflected some type of preexisting, permissible, unwritten company practice or policy, as T-Mobile appears to contend, record evidence shows the rule was disparately enforced against Befort's email. For instance, the ALJ found that a non-supervisory senior representative at least once emailed the entire call center asking about a lost phone charger, and that customer service representatives used the reply-all function in response to facility-wide emails containing birth announcements, or baby shower or death notices. The ALJ also found that T-Mobile had failed to demonstrate that management's mass emails about, for instance, snacks in the office, free hockey tickets, and employee salsa-making and lip sync contests served a business purpose. Elliott's statement, in other words, was "inconsistent with [T-Mobile's] practice of permitting other [non-business-related mass emails]," including emails from non-managerial employees like Befort. *Guard Publ'g*, 571 F.3d at 60.

The Board does not dispute that at least some of the emails it recognizes were of the character Elliott claimed was barred. The Board instead contends that substantial evidence supports its finding that the emails "were not similar in character to Befort's." *T-Mobile I*, 369 N.L.R.B. at 3 (J.A. 14). To that end, the Board downplays other emails in evidence as "just nine examples of nonwork-related mass emails that were sent to the entire facility, most of which were sent on behalf of the Employer itself." Resp't Br. 24. Even that characterization overlooks types of personal-milestone emails like birth announcements and death notices; copies of those emails are not in the record, but the ALJ found based on T-Mobile's admissions and employees' testimony that they had been allowed.

The Board rests on the line it drew post hoc between "emails that [T-Mobile] sent for *its own business-related interests*" and "mass emails [that employees sent] *for their personal benefit . . .* [or] *to further [an] organizational purpose*." *T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 3 (J.A. 14) (emphasis added). T-Mobile now picks up on that post hoc distinction, highlighting the lack of evidence that employees had "ever been permitted to send a mass email on behalf of, or in support of, any outside organization." Intervenor Br. 7. Elliott himself drew no such fine line, however, instead categorizing as impermissible "mass communication for any non-business purpose." J.A. 181. T-Mobile and the Board recast the ban on "mass communication for any non-business purpose" in an effort to address evidence of the mass emails that it permitted, distinguishing them as serving T-Mobile's own "business-related interests."

Only with that post hoc refinement of T-Mobile's rationale does the Board or T-Mobile claim to be able to distinguish non-business emails about free popcorn and slushies and birth

announcements from Befort's email. *T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 3 (J.A. 14). According to the Board, such emails "foster employee morale." *Id.*[4] But even that belated distinction does not successfully address all the emails T-Mobile permitted. In describing permissible emails as those management sent for its own business-related interests, the Board fails to account for replies to emails announcing personal milestones that were sent by customer representatives no different from Befort. And an employee's query whether anyone had seen their lost charger is most obviously for the employee's "personal benefit," putting it on the impermissible side of the Board's line. *Id.*

T-Mobile's stated rationales for reprimanding Befort do not just fall short as neutral explanations for its actions; they provide affirmative support for the union's claim that the company singled out Befort's email based on its union content. Aside from Elliott's email, the only other explanation T-Mobile gave Befort after she sent her email was in a meeting with her manager, Lillian Maron. According to Befort, whose testimony the ALJ credited over Maron's, Maron said that customer service representatives "cannot send out mass emails and that *anything union-related* cannot be sent while on the clock." J.A. 52 (emphasis added). When Befort pointed out that she was not on the clock when she sent her emails, Maron countered that recipients of the email were on the clock when they opened and read the email. Maron further stated that "anything union-related could not be done . . . by using the company's email system[.]" *Id.* If T-Mobile had an unwritten and unenforced rule against mass mails, then, Maron's statements suggest "only one explanation [for enforcing it

---

[4] The Board did not challenge the ALJ's finding that T-Mobile failed to demonstrate "that slushies, popcorn, and lip sync contests actually elevate employee morale at [the call center] beyond the moment of the event." *Id.* at 16 (J.A. 27).

against Befort]: she had used the system for dissemination of union information." *Guard Publ'g*, 571 F.3d at 60 (cleaned up). This despite the fact that, as the Board acknowledges, T-Mobile allows other personal uses of its email system; such permission is explicit in the Acceptable Use Policy.

Other actions taken and statements made by T-Mobile in response to Befort's email likewise reflect a singling out of union content. The Third Party Activity Report that it generated in response to Befort's email, for instance, is an action T-Mobile acknowledges taking only in response to union activity. And, as the Board explained with regard to the lone issue on which it affirmed the ALJ, T-Mobile violated the Act, including through Elliott's email, when it told its employees that they could not talk about the union during worktime despite permitting discussions of other nonwork subjects during worktime. *See T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 1 (J.A. 12); *see also Oberthur Techs. of Am. Corp. v. NLRB*, 865 F.3d 719, 724 (D.C. Cir. 2017) ("It is well established that an employer's warning directing employees to 'cease Union-related discussions only' constitutes a Section 8(a)(1) violation.").

Based on the evidence of disparate treatment of Befort's email and related facts suggesting a singling out of the union, "substantial evidence does not support the Board's determination that [Befort] was disciplined for a reason other than that she sent a union-related email." *Guard Publ'g*, 571 F.3d at 60. The Board sidestepped those facts only by relying on the type of post hoc distinction that we deemed impermissible in *Guard Publishing*. We thus grant the Union's petition for review.

## B. Remaining Claims

In addition to its discrimination claim, the Union challenges the Board's resolution of three other unfair labor practice claims related to Befort's email. Its first two challenges are to the lawfulness of restrictions on the ability of T-Mobile employees to communicate about the Union, as stated by Elliott in his June 2 email; the third concerns a statement by Maron to Befort in their meeting that the ALJ found was coercive. In light of our discrimination holding, we grant the Union's petition for review on each of these partially overlapping claims as well.

After holding that T-Mobile did not unlawfully discriminate, the Board stated that the lawfulness of T-Mobile's conduct with regard to the additional allegations was "dependent on whether Befort had a Section 7 right under *Caesars Entertainment* to use her work email to send her message to her coworkers about joining the Union." *T-Mobile II*, 369 N.L.R.B. No. 90, slip op. at 1 (J.A. 37). Because there was no evidence that this case implicated a limited exception to *Caesars* that permits employees access to company email for non-business (including union-related) use where employees "would otherwise be deprived of any reasonable means of communication with each other," the Board concluded that "Befort did not have a Section 7 right to use her work email to send her messages to her coworkers." *Id.* In other words, T-Mobile "was entitled to exercise its property rights to restrict Befort's use of its email system for that purpose." *Id.* Based on that conclusion, the Board rejected the Union's claim that T-Mobile violated Section 8(a)(1) by announcing the workplace rules in Elliott's email and by telling Befort that employees could not send mass emails or union-related emails to coworkers' work email addresses. *Id.* The Board held that those actions were taken "in response to Befort's impermissible

use of its email system in light of [T-Mobile's] lawful restriction, and not because she had engaged in any protected activity." *Id.*

**1.** The Union's first two claims are based on three restrictions on communication included in Elliott's email. The first is a rule against mass emails, based on Elliott's statement that "[w]e don't allow mass communication for any non-business purpose." J.A. 181. The second is a rule against social media use during work, based on his statement that employees are permitted to "use social networks—off the job of course." *Id.* And the third is a rule against discussing the Union during work, based on his statements that "[e]mployees have countless opportunities to communicate with others when they are not working—about the union or anything else"—but that "it is not appropriate to solicit or discuss other issues when you are supposed to be working." *Id.* Elliott testified that those rules did not alter existing T-Mobile policies, but the ALJ found otherwise, and the Board in its supplemental decision seems to have accepted the ALJ's finding. *T-Mobile II*, 369 N.L.R.B. No. 90, slip op. at 1 n.1 (J.A. 37) (referencing the "new workplace rules").

Section 8(a)(1) of the NLRA states that it is an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" their organizing rights. 29 U.S.C. § 158. Board precedent not challenged here identifies distinct circumstances in which maintenance of even a facially neutral workplace rule can violate Section 8(a)(1). One such circumstance is where "the rule was promulgated in response to union activity." *Boeing Co.*, 365 N.L.R.B. No. 154, slip op. at 1 (Dec. 14, 2017) (quoting *Lutheran Heritage Village-Livonia*, 343 N.L.R.B. 646, 646-47 (2004)); *see also AdvancePierre Foods, Inc.*, 366 N.L.R.B. No. 133, slip op. at 1-2 n.4 (July 19, 2018). Another such circumstance is where the rule is overbroad. To assess

overbreadth, the Board asks whether a facially neutral rule, "when reasonably interpreted, would potentially interfere with the exercise of NLRA rights." *Boeing*, 365 N.L.R.B. No. 154, slip op. at 3. If a rule "would *not* prohibit or interfere with the exercise of NLRA rights, maintenance of the rule is lawful without any need to evaluate or balance business justifications, and the Board's inquiry into maintenance of the rule comes to an end." *Id.* at 16. If it *would* prohibit or interfere with the exercise of NLRA rights, the Board then balances "the nature and extent of the potential impact" on those rights against the "legitimate justifications associated with the rule." *Id.* at 3. "[T]he rule's maintenance will violate Section 8(a)(1) if the Board determines that the justifications are outweighed by the adverse impact on rights protected by Section 7." *Id.* at 16.

The parties agree that the lawfulness of the new rules on the first issue—whether they were "in response to union activity"—rises or falls with whether T-Mobile's responses to Befort's email were discriminatory. That is to say, if T-Mobile discriminated against union activity in reprimanding Befort, the rules that it promulgated in the course of doing so were part of its reaction to union activity. If, on the other hand, substantial evidence supports the Board's determination that T-Mobile did not discriminate, then substantial evidence supports its finding that the rules were instead promulgated "in response to Befort's impermissible use of [its] email system." *Id.* at 1. Because we grant the petition on the discrimination issue, we also hold that the rules were impermissibly promulgated in response to Section 7 activity.

As to overbreadth, the Board reversed the ALJ's finding that rules prohibiting mass emails and use of social media at work were overbroad because the Board thought employees would not reasonably interpret them to interfere with NLRA

rights. *Id.* at 1 n.1.[5] The Board's holding followed from its conclusion that the rules were not issued in response to union activity. "Because [T-Mobile] sent its email in response to Befort's violation of several of its policies," it held, "all of the employees reasonably knew that [T-Mobile] promulgated its rules . . . because of Befort's improper use of its email system, and not because she had engaged in any protected activity." *Id.*

The Board's rejection of the Union's overbreadth claim rests on the premise that Befort had no Section 7 right to use T-Mobile's email system. That reasoning falls short in light of our discrimination holding. Under *Caesars Entertainment*, a company still violates the Act if it restricts employee use of IT resources in a union-targeted or discriminatory fashion. *See* 368 N.L.R.B. No. 143, slip op. at 8. That is what T-Mobile did here. Before Elliott's email, T-Mobile did not, in practice, bar mass emails, and both written policy and company practice permitted employee use of social media at work. Elliott's email announcing new restrictions on those activities was a response to union activity, as we have already held. It is thus unclear in what way employees could interpret the restrictions not to "interfere with the exercise of NLRA rights," such as communications about the Union like Befort's. *Boeing*, 365 N.L.R.B. No. 154, slip op. at 3. Because the Board reached only the first part of its overbreadth test, we remand for the

---

[5] With regard to the restriction on discussing the union in the workplace, the Board affirmed the ALJ, holding that, in its responses to Befort's email on June 2 and other conduct not relevant to these petitions, T-Mobile "violated Section 8(a)(1) by telling employees that they could not talk about the Union during worktime in working areas despite permitting discussions of other subjects 'not associated or connected with their work tasks.'" *T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 1 (J.A. 12) (quoting *Jensen Enterprises, Inc.*, 330 N.L.R.B. 877, 878 (2003)).

Board to consider the remainder in the first instance in light of our decision.

**2.** Lastly, the Union claims that the Board erred in reversing the ALJ's finding that Maron's statement that Befort "was prohibited from sending Union-related emails to employees' work email addresses" was coercive. *T-Mobile I*, 369 N.L.R.B. No. 50, slip op. at 18 (J.A. 29). The ALJ so found, citing then-controlling Board precedent that held employees have a right under the NLRA to use company email for Section 7 communications during nonworking time. *Caesars Entertainment* overruled that precedent and, as part of its analysis upholding the email and social media restrictions, the Board reversed the ALJ's finding.

To evaluate a claim that an employer communication was coercive under Section 8(a)(1), we ask whether, "'considering the totality of the circumstances,' [the] employer's statement 'ha[d] a reasonable tendency to coerce or to interfere with' an employee's Section 7 right to communicate about the union." *Oberthur Techs.*, 865 F.3d at 724 (quoting *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001)). The Board briefing does not independently address Maron's statement, but its position seems to be that it was not coercive because it was made in response to "Befort's impermissible use of [T-Mobile's] email system." *T-Mobile II*, 369 N.L.R.B. No. 90, slip op. at 1 (J.A. 37); *see* Oral Arg. Tr. 32. As explained above, that rationale falls short. Even though, under *Caesars*, Befort lacked a statutory right to email use for Section 7 activity, T-Mobile itself permitted its employees to send union-related emails to work addresses, as the talking points Maron brought to her meeting with Befort expressly acknowledged. Maron's prohibitory statement thus lacked a basis in T-Mobile policies, and the Board failed to identify any ground for

reversing the ALJ's finding that it was coercive. We accordingly remand for the Board to reconsider its reversal.

\* \* \*

For the foregoing reasons, we grant the Union's petitions for review and remand the case for further proceedings consistent with this opinion.

*So ordered.*